CASE 55—ACTION BY THE CINCINNATI WAREHOUSE COMPANY AGAINST
LESLIE & WHITTAKER'S TRUSTEE AND OTHERS TO RECOVER PRO-
CEEDS OF TOBACCO.—JAN. 29.

# Cincinnati Tobacco Warehouse Co. v. Leslie & Whittaker's Trustee, &c.

APPEAL FROM HARRISON CIRCUIT COURT.

JUDGMENT FOR DEFENDANTS AND PLAINTIFF APPEALS. REVERSED.

FACTORS—ADVANCES—LIENS—CHARACTER—ASSIGNMENT  OF  DEBT.—
TRANSFER OF LIEN.

Held:   1. Where a corporation advanced money to a bankrupt
with which to purchase tobacco to be shipped to the corporation
for sale under an agreement that the latter was to have a
lien on the tobacco so purchased, and that the debt for advances,
commissions, insurance, etc., should be paid out of the proceeds
of the sales when made, the lien of the corporation was not a
common-law lien which was personal to it, but was an equitable
lien, which attached to the claim, and therefore passed to the
corporation's successor, which purchased its assets on its in-
solvency, including the debt for which tobacco so purchased was
pledged.

J. J. BLANTON, ATTORNEY FOR APPELLANT.

## POINTS AND AUTHORITIES.

1. That a warehouseman who makes advances upon the agree-
ment with another that he is to buy tobacco, prize and ship it
to the warehouse for sale, and who is to be reimbursed out of
the proceeds of the tobacco when sold, has by virtue of the
contract an inchoate right in or to the property on the faith
of which the advance was made, and this right becomes com-
plete by reducing the property to possession before other equi-
ties intervene, and this equity relates back to the time the con-
tract was made. Brooks, Waterfield & Co. v. Stanton's Admr.,
79 Ky., 178; Hoffman v. Burns, 83 Ky., 400; Cook v. Branin,
87 Ky., 101; Holly Mfg. v. New Castle, 48 Fed. Rep., 879;

Buchan v. Sumner, 47 Amer. Dec., 305; Pomeroy's Equity Juris., subsec. 4 of·sec. 171.

2. That the owner and holder of this lien or equity may assign or transfer it to another with the claim it seems.

And in case of a voluntary assignment the claim and the lien pass to the assignee who can pass title thereto by sale or transfer. Francklyn v. Sprague, 10 Hun. (N. Y.), 589; Rogers v. Grothe, 58 Pa. St., 414; Story on Agency, 367; Terry v. Baunberger, 44 Com., 561; Jones on Liens, secs. 28-112, 984-991, 1012; Beau v. Balton, 3 Phila., 87.

3. The equity is not a mere personal privilege but is a charge or incumbrance upon the personal property; it is an equitable right or interest in the property to secure the payment of the advance. Jones on Liens, secs. 985, 991; Jones on Liens, sec. 28.

4. That courts of equity uniformly recognize their jurisdiction over these liens or equities, and enforce the equitable rights of the parties. Ford v. Sproule, 2 A. K. M., 528; Black v. Branin, 5 Dana, 312; Knapp v. McCafferty, 69 Am. Dec., 290; Pomeroy's Eq. Juris., secs. 112, 164, 1231.

5. That a trustee in bankruptcy or an assignee has no greater or other rights than the bankrupt or the assignor, and the equitable lien of the Warehouse Company having been made complete by possession of the property before bankruptcy or assignment will prevail against the claim of the trustee or assignee for the proceeds of the pledged property.

We therefore ask for a reversal of the judgment, with directions to adjudge the proceeds of the tobacco to the appellant. Kentucky Statutes, sec. 75; May, Receiver v. Dills, 19 Ky., 514; Forepaugh v. Appol, 17 B. M., 630; McAlister v. O. V. B. & T. Co., 24 Ky., 1309.

6. A local soliciting agent of the appellant is not such an officer or agent of the company contemplated by section 72, and also subsection 33 of section 732 of the Code of Practice, upon whom service of process may be had in an action against the corporation.

OPINION OF THE COURT BY JUDGE BARKER—REVERSING.

Leslie & Whittaker resided in Harrison county, Ky., and were engaged in the business of buying and selling tobacco for speculation. The Cincinnati Leaf Tobacco Warehouse Company was a Kentucky corporation, doing business in Cincinnati, Ohio. During the years 1898, 1899, and 1900,

these parties had a contract between them by which the corporation advanced money to the firm from time to time, as they required it, which was invested in the purchase of tobacco, and then consigned to the corporation at its business place in Cincinnati for sale, with the express agreement that the corporation was to have a lien upon the tobacco so purchased, and the debt for advances, commissions, insurance, etc., should be paid out of the proceeds of the sales when made. Under this agreement the corporation, from August 31, 1899, to September 12, 1900, advanced Leslie & Whittaker the sum of $5,060.23, and during the same period of time they purchased and consigned, under the contract eighty-three hogsheads of tobacco, all but thirteen of which had been sold and the proceeds applied to the extinguishment of the consignee's debt for advancements, at the time this controversy arose. Before the sale of the thirteen hogsheads of tobacco above mentioned, and which are in controversy here, the Cincinnati Leaf Tobacco Warehouse Company became seriously involved financially, if not insolvent, and proper proceedings were had in the circuit court of Kenton county, by which it was placed in the hands of a receiver, and afterwards the receiver was authorized to and did sell at public auction in solido all of its assets, whether real, personal, or mixed, for the sum of $1,500,000, the Cincinnati Tobacco Warehouse Company becoming the purchaser at the sum named. This sale was confirmed by the court, and the Cincinnati Tobacco Warehouse Company, which seems to have been organized for this express purpose, stepped into the shoes of the Cincinnati Leaf Tobacco Warehouse Company, taking up the business of the latter, and carrying it forward without commercial jar or jostle, as if no change had occurred. About this time, or shortly thereafter, Leslie & Whittaker became

involved, and made a general assignment of all their property to W. T. Lafferty, of Harrison county, Ky., for the benefit of their creditors. The assignee, ascertaining that there were thirteen hogsheads of tobacco belonging to his assignors, unsold, in the warehouse of the Cincinnati Tobacco Warehouse Company, ordered it sold. In accordance with this direction, the tobacco was sold, realizing the sum of $950. Afterwards certain creditors of Leslie & Whittaker set on foot such proceedings in bankruptcy that the firm were adjudged to be bankrupt under the United States bankruptcy act, and their assets passed into the hands of appellee J. T. Webster, as trustee, for the benefit of their creditors. After qualifying, the trustee instituted this action to recover of appellant the proceeds of the sale of the thirteen hogsheads of tobacco which were sold under the order of the assignee, as above stated. This sum, amounting to $950, is the matter in controversy here. The question is one of law, there being no undisputed questions of fact.

There is no dispute or question as to the regularity of the legal proceedings by which the Cincinnati Tobacco Warehouse Company purchased all of the assets of whatever kind of the Cincinnati Leaf Tobacco Warehouse Company; as to the amount or time of the advancements made by the Cincinnati Leaf Tobacco Warehouse Company to Leslie & Whittaker; nor as to the fact that the tobacco shipped under the contract realized a sum insufficient to pay the amount of the advancements by $350. But it is contended by appellee that the Cincinnati Tobacco Warehouse Company did not acquire, by its purchase, the benefit of the contract existing between the Cincinnati Leaf Tobacco Warehouse Company and Leslie & Whittaker, or the lien which the latter had, under the express contract, on all the tobacco shipped for the payment of all the

advancements made; that the lien of the Cincinnati Leaf To-
bacco Warehouse Company was a personal one, which did
not pass by operation of law under the sale, and that, there-
fore, the thirteen hogsheads of tobacco remaining unsold after
the transfer by the court are to be considered as a matter sep-
arate and apart from the old contract, and that out of the
proceeds appellant was entitled only to collect and receive its
commission, drayage, insurance, etc., and had no right to ap-
ply it to the extinguishment of the unpaid balance originally
due the Cincinnati Leaf Tobacco Warehouse Company.    On
the contract appellant contends that, having purchased at
the sale by the receiver of the Cincinnati Leaf Tobacco Ware-
house Company all its assets, including the chose in action due
from Leslie & Whittaker, consisting of the unpaid balance for
the advancements made to them, it also acquired the lien un-
der the contract, and with it the right to apply the proceeds
of the sale of all the tobacco, including the thirteen hogsheads,
to extinguish the debt.   If this can be done, there will still
be a balance due appellant of $350.   Upon trial of the case
in the court below the learned chancellor entered the follow-
ing judgment. "It appears further from this record that the
whole of the tobacco bought by Leslie & Whittaker was deliv-
ered by them to the Cincinnati Leaf Tobacco Warehouse Com-
pany prior to the appointment of a receiver, and prior to the
sale by decree of court of its effects.   There can therefore be
no question but that the factor's lien of the Cincinnati Leaf
Tobacco Warehouse Company was a complete lien, perfected
by reducing the tobacco to possession.   The only question in
this case, then, is, does the Cincinnati Tobacco Warehouse
Company, by reason of its purchase at decretal sale of the de-
mand of the Cincinnati Leaf Tobacco Warehouse Company
against Leslie & Whittaker (they being no parties to that suit,

and not obtaining their consent), succeed to the rights of the
Cincinnati Leaf Tobacco Warehouse Company as against them
or their general creditors. they having become bankrupt before
a sale of the tobacco by the defendant (appellant) ? Or, stating
it more succintly, does the purchase by defendant defeat or dis-
charge the lien? It seems from the authorities that a lien of
this character 'is a purely personal privilege, and can only be
set up by the person to whom it accrued, and that he can
not assign his claim, so as to enable the assignee to set up the
lien as a ground of claim or defense to an action for the prop-
erty or its value as against the general owner.' The court
holds that these transactions by which defendant (appellant)
obtained the debt and the property destroyed the lien, and it
is not available to the defendant in this action." It will be
observed that the trial judge placed some stress upon the fact
that the Cincinnati Tobacco Warehouse Company obtained its
legal position with reference to the assets of the Cincinnati
Leaf Tobacco Warehouse Company without the knowledge or
consent of Leslie & Whittaker. If this be important, we think
the record shows conclusively that Leslie & Whittaker recog-
nized the Cincinnati Tobacco Warehouse Company as the suc-
cessor of the Cincinnati Leaf Tobacco Warehouse Company,
and as lawfully assuming and carrying out the latter's con-
tract with them. Five of the hogsheads of tobacco in question
were shipped to and received by the Cincinnati Tobacco Ware-
house Company after it became the successor of the Cincin-
nati Leaf Tobacco Warehouse Company; and Leslie & Whit-
taker received from it, upon request, the sum of $269 with
which either to purchase tobacco or to pay for tobacco already
purchased under the original contract. It seems to us that
these facts, under all the circumstances of this case, would
go very far towards establishing a ratification by Leslie &

Whittaker of the transfer by the receiver of the insolvent corporation to appellant, if it were required to take that view in order to uphold appellant's lien in question; but we do not think this is necessary. It is true that the authorities hold that a common-law lien is a personal privilege, and not transferable by the assignment of the debt which it secures; but we think the court below erred in assuming that the lien of appellant is a common-law lien. Common-law liens arise by implication of law, and not by express contract. The lien here is an equitable one, growing out of the express contract between Leslie & Whittaker on the one part and the Cincinnati Leaf Tobacco Warehouse Company on the other, by which it was agreed that the latter should have a lien on the tobacco for all the advances made by it to the former, and which appellant claims passed to it by the assignment. Jones, in his work on Liens, very elaborately describes the difference between common-law and equitable liens, and in section 63, in describing equitable liens, says: "Where in terms the parties agree that one making advances for the purchase of merchandise to be shipped to him shall have a lien on the same, the lien arises upon the purchase of the merchandise before it is consigned to the creditor. The lien in such case attaches to the merchandise purchased and in the hands of the debtor at the time of his bankruptcy, and may be asserted against the debtor's assignee in bankruptcy. Judge Story said that the possession of the property by the debtor was not a badge or fraud, or against the policy of the law, or in any manner to be deemed inconsistent with the just rights of his general creditors; and therefore the agreement to give a lien or equitable charge was binding upon the property in the hands of the assignee." In section 982, Id., it is said: "A common law lien is not a proper subject of sale or assignment, for it is

neither property or is it a debt, but a right to retain property as security for a debt." And in section 983, still speaking of common-iaw liens: "A lien is a purely personal privilege, and can only be set up by the person to whom it accrued. He cannot assign his claim, so as to enable the assignee to set up the lien as a ground of claim or defense to an action for the property or its value as against the general owner." In section 991, however, the author says: "An equitable lien reserved by express agreement passes by an assignment of the debt it was created to secure. Such a lien does not depend upon possession, as does a common law lien." The case of Hauselt v. Harrison, 105 U. S., 401, 26 L. Ed., 1075, was in all respects similar in principle to the case at bar. There a merchant advanced money to a tanner with which to purchase hides to be manufactured into leather, under this agreement: "And it is further agreed that all the skins, whether green, in process of tanning, tanned, or tanned and finished, shall be considered as security for the refunding, with interest, of all the moneys advanced him by the party of the second part, and that all the skins shall be insured for their full value in good companies only." The tanner, after receiving large advances, became insolvent, and in the contest between his assignee and the merchant as to the lien of the latter on certain hides and leathers the Supreme court said: "It was decided in Gregory v. Morris, 96 U. S., 619 (24 L. Ed., 740), that the legal effect of such a contract is to create a charge upon the property, not in the nature of a pledge, but of a mortgage. Such a lien is good between the parties without a change of possession, even though void as against subsequent purchasers in good faith without notice and creditors levying executions or attachments; and, if followed by a delivery

Cin. Tob. War. Co. v. Leslie & Whittaker's Trustee, &c.

of possession, before the rights of third persons have inter-
vened, it is good absolutely. Nor can it be reasonably
doubted that this equitable lien was capable of enforce-
ment. If Bayer (the tanner) had, in disregard and violation
of this agreement, undertaken to divert the skins, whether
in a finished or unfinished state, to some other and unauthor-
ized use, it would have been in fraud of the rights of Hauselt
(the merchant), and a court of equity would not have hesi-
tated by an injunction to prevent the commission or continu-
ance of the wrong. Bayer would, under such circumstances,
be treated by a court of equity as a trustee fraudulently
dealing with and misappropriating trust property, and Hau-
selt would be protected in his right as the owner of a bene-
ficial interest in the property entitled to the enjoyment of
the specific fruits of the agreement." In Brooks, Water-
field & Co. v. Staton's Adm'r, 2 R., 56, 79 Ky., 174, it is
said by this court: "Manifestly, there in an equity in one
who advances money on the agreement and faith that cer-
tain property shall be intrusted to him as a security which
does not pertain to a general creditor, or to one who extends
credit without reference to any particular fund or property
as security. From the moment the advances are made
there is an inchoate right in or to the property on the faith
of which the advance was made, and this right becomes com-
plete if the creditor with reasonable diligence pursues his
right by reducing the property to possession before any
other equity has intervened. Such contracts, when the
money has been advanced, and before delivery of possession,
are partly executed and partly executory. The delivery of
possession completes the contract; and if, at the time the con-
tract was entered into and the advances made, the parties
acted in good faith, and there was no insolvency, and no de-

sign to prefer one creditor to another, the act of possession, when there are no intervening equities, relates back, and the contract is a unit from the time it was entered into and the advance was made." This case was approved in a later case of Cook's Adm'r v. Brannin, Brand & Glover, 87 Ky., 101, 9 R., 955, 7 S. W., 877. In the case of Stahl v. Lowe (18 R., 960, 19 R., 210) 38 S. W., 862, it was held that a transaction similar to the one involved in the case at bar created an equitable lien and in the case of Atchison's Assignee v. Jones & Halsey's Assignees (8 R., 259) 1 S. W., 406, it was held: "A firm to which tobacco had been consigned for the purpose of securing advances made by them thereon, having made an assignment for the benefit of creditors, their assignee had the right to hold the tobacco for the purpose of securing the advances against the assignee of the consignor, who, subsequent to the consignment, had also made an assignment for the benefit of creditors." The Cyclopædia of Law & Procedure, volume 4, page 69, titled "Assignments," states the rule thus: "In the absence of any stipulation in the contract of assignment concerning the securities or o ther incidents, an unqualified assignment of a chose in action carries with it, as an incident to the chose, all securities held by the assignor as collateral to the claim, and all rights incidental thereto, and vests in the assignee the equitable title to such collateral securities and incidental rights. . . . As the right to the chose and its incidents pass to the assignee thereof, so does the right to the remedies which the assignor had for the enforcement of the same." In the case of Summers v. Kilgus, 14 Bush, 449, it was said: "The assignment of a debt carries with it a vendor's or mortgage lien, by which the debt is secured. This has been so often decided by this court as to render the citation of authority unnecessary."

There is a vast difference between the narrow, rigid, personal right to merely retain possession of personal property until payment, which is known as a common law lien, and an equitable lien arising by express contract between the parties, and which the needs of commerce render absolutely necessary in order to facilitate modern dealing between man and man. It requires no profound examination of the subject to realize how hopelessly crippled would be the industries and resources of the whole State if the farmer, the manufacturer, and the dealer could not obtain the aid of the capitalist in the advancement of their business; or that this aid very largely, if not wholly, depends on the ability of the borrower to make the lender secure by a lien on the specific product of the industry involved in the enterprise. The lien involved in this action is not the common law lien of the factor for advancements, but an equitable lien, created by express contract. Sometimes these liens resemble each other very closely, and sometimes both statutory and equitable liens coincide, and are identical with or declaratory of common law liens. When this happens, the latter are superseded by the former, for, although their forms and terms may resemble, the consequences which flow from their existence, as in the case at bar, are often divergent. Appellant, as assignee of the chose in action purchased at the receiver's sale, became invested thereby with the right to enforce the equitable lien which secured its payment to the Cincinnati Leaf Tobacco Warehouse Company.

Wherefore the judgment is reversed, with directions to dismiss the petition.